Today we have a special motion. I am going to make the motion, so I will turn over the presiding task to Judge Chen. I'm hoping that there are no dissenters in the two-judge panel that remains. Holly, will you please stand? I move the admission of Holly Kathleen Victorson, who is a member of the bar and is in good standing with the highest courts of California. I have knowledge of her and I'm satisfied that she possesses the necessary qualifications. Holly has been my law clerk for a little more than a year now and she's conducted herself exceedingly well. She has been smart, hard-working, a great writer, but most importantly she's been an absolute joy to work with and have in the chambers. I'm going to miss her tremendously when she moves on, but I know that our bar will be better off for having her in it. So, I'll let my colleagues deliberate and see if they accept my motion, grant my motion. All right. Judge Stoll, what do you think? I think that I agree with Judge Moore's motion. Holly has been a fantastic law clerk and a joy to have at the court. Okay, thank you. I also know something about Ms. Victorson's qualities. I interviewed her, I gave her an offer to clerk, she decided to go a different direction. Based on the strength of your recommendation, based on your experience with Ms. Victorson and the fact that she was able to endure a clerkship with you for over a year. What doesn't kill you makes you stronger. The court grants your motion, Judge Moore. Holly, please raise your right hand and Jen, our courtroom deputy, is going to swear you in. Okay. Now, our next matter of business is our first case, 2016-2347, Specialty Fertilizer Products vs. Shell Oil Company. Mr. Collins, please proceed. Thank you, Your Honor. May it please the court. We believe that there are three principal issues that need to be dealt with that can disappeal. First is the full scope of the prior art on the question of obviousness. Second is the unrebutted test evidence from the patent owner, establishing that the method of making the patent was complete avoidance of the due process confrontation issue in this case. As to obviousness, the, quote, additional reasoning, unquote, for the board decision relies very heavily on the to ignore fully two-thirds of the disclosure of the BECCS and PCT reference. As correctly noted by the panel of the examination, examiners in the RAM, there are three equal billing scenarios, A, B, and C. Ammonium sulfate alone, ammonium phosphate alone, and a combination of ammonium sulfate plus ammonium phosphate. When all of these scenarios are considered, there is an infinity of disclosed compositions outside the claims. Moreover, the ranges in BECCS and PCT are not designed to teach anything to a skilled artisan. They have one to 99%. I submit that's more of a patent lawyer's range than a scientist's range. One of the things I was struggling with was whether your specification in any way addresses the criticality of the ranges that you've claimed. Is there anything in your specification that talks about why those ranges might be important? Yes, we talk about it in the context, Your Honor, of providing the microenvironments of acidity. In other words, the real key to the invention, or one key, is certainly the fact that you get these microenvironments where you can enhance the uptake of micronutrients without completely having bulk soil acidification, which is ultimately detrimental to yield. Where is that in your specification? And again, I'm talking about with respect to this specific claimed range. Yes, it recites that the ranges are important for achieving that result in the first part of the case. I can get the site for you. But I must admit there's no data in the application that supports that. But does it say something like, you know, this particular range provides this advantage or anything like that? I believe it does. I'll have a chance to look at it and be back. But I believe so, yes. Okay, pardon me. But in any event, these ranges are so broad that it's difficult to get a broader range than 1 to 99%. And then 1 to 80 on the elemental sulfur. Bottom line is, a skilled artisan reading Bexton PCT would have a host of unanswered questions. How much sulfur do I use? How much ammonium sulfate? How much ammonium phosphate? And we submit that this case falls squarely into the situation described in the Peterson case, where there are a multitude of distinct compositions. And accordingly, we also contend that the examiner's position in the RAND, setting forth that the art did not establish a prima facie case and analyzing this on the basis of a genus species, is entirely correct. The claims also require that the granules, when applied to soil, create lower pH portions. Now, while Bexton PCT broadly mentions acidification, there's no teaching of the claims localized acidification. As explained by our expert, Dr. Rush, soil chemistry is exceedingly complex. And you can't a priori say that something's going to work, because you need to actually test a given composition to determine whether it has these properties. But your problem is that we have a standard of review to apply, and the standard of review is substantial evidence. And Dr. Blair testified that each of the components would have an acidifying effect, and that therefore lower pH was inherent. You may be right. He may be wrong. But how do I conclude there isn't substantial evidence for that fact finding by the PTO? Well, first of all, I mean, our position is that none of these declarations are properly considered because of the issue of confrontation. That they cannot amount to substantial evidence under those conditions. What if we disagree with you based on the Abbott case? Then what is your response to Judge Moore's question? Well, the board did not adopt Blair's opinions. He just said it was inherent. There's nothing in the board opinion where it says we adopt this opinion. So I don't see how this court can make its own findings of fact on this, because the board never applied the Blair declaration. But the board made a finding of fact. Your point is that we can't rely on the Blair declaration to support the board's finding of fact because the board didn't expressly say that it was relying on Blair's declaration. Well, I think you've run into a generic problem, because this court cannot sustain a decision below based upon facts that are not in the record. And so, in other words, this court cannot fill in the blanks for the board opinion. Now, the second issue was commercial success. We believe it's very important to understand what is not an issue. Virtually none of the factual matters set forth in the Bocard declaration are disputed. Huge product sales, increasing market share, price premiums, advertising and promotion focused on yield enhancement. Products are covered by the claims. The customer benefits the products. You don't have a patent claim to a specific formulation that matches up with the commercialized product, right? The commercialized product that you say that you got enjoyed commercial success with, it's just one specific formulation of the patent claim composition, which covers broad ranges of different ingredients. That is true. So, therefore, the concern is that your commercial success is not truly commensurate with the scope of the claim. I mean, there's so many different iterations of products that could be made with your claim composition. So, how do we have any confidence that the full range of your claim is truly going to drive commercial success in the same way that this very specific formulation did? Well, Your Honor, first of all, I think the law is clear. I forget the name of the case, but this court has decided that you don't have to show commercial success to the full scope of the claims. Well, there has to be something reasonably commensurate with the scope of the claim, I guess, is what I'm concerned about. And if you have one percentage that's, I don't know, 0.25 to 25 percent and another ingredient that's, I don't know, 2 to 49 percent, you know, these are really, really broad ranges. And so, yes, you have commercial success, or we could argue that you do, for one particularized formulation of it. But I don't know what that tells us. I mean, if you had a dependent claim, for example, to this very specific formulation, then there would be a much more tight nexus between that specific formulation claimed in a dependent claim and the commercialized product. Here, I don't know if we can say we have that given the breadth of the claim and all the different types of compositions that are actually being covered by your claim. Well, Your Honor, but, you know, commercialization is different than talking about scope of claims. I mean, if you have a product that is successful, you don't go out and make other products just to satisfy some patent document. In other words, there are three products, and they are all commercially successful. Now, and I don't believe that it's correct to say that your commercial success must be commensurate with scope of the claims. I believe that to be not the case under the law. And I can't remember the name of the case, but that came up during the argument before the Board of Appeals. And the board said, no, no, you can't. That is not the law. But in any case, I don't understand how, to prove commercial success, you would have to show everything within the range of your claims. Because we're talking about commercial success, not some sort of patent range. So, as I say, you don't go and make products. I'm not suggesting you have to make, you know, 4 million different products and then put them all out on the market and then show that each one of the 4 million enjoyed commercial success. But we don't have that situation here. We're on the other end of the spectrum where you have one data point. We have three different products. Okay. You have three, maybe. Right. And then there's a whole much wider range. And then, in the face of all that, we have a prior art reference, Bexton, I believe, which teaches combining all these different elements already. So now we need to try to figure out is there something specific about what's inside your claimed ranges that's driving the commercial success aside from what Bexton already teaches, which is the broad general teaching of combining these very same elements however you see fit. Well, all I can say is the commercial success is real, and it is for three different products at least. And I guess I don't understand why you say we don't have to go out and make a million different products and say that they're all commercially successful. How many do we have to make? I mean, we have three products, and we have extraordinary commercial success with those three products, and they're covered by the claims. But the fact that they're covered by the claims doesn't help you necessarily in front of the PTO. The fact that they're covered by the claims of this were a contested proceeding in a district court litigation would give you a presumption of nexus. But the PTO said you're not entitled to the presumption of nexus because these reexams are not contested cases. So that means you had to prove that the commercial success was attributed to the claims and the inventive aspects of those claims over the prior art. And that's where they said you failed to prove. So even if you meet the commensurate in scope issue, you still have the issue of the nexus for the commercial success. Well, I'd say two things to that, Your Honor. Number one, under the broadband case, the reasoning in that case is not limited to contested proceedings. Here you have a situation where two parties are on an equal evidentiary footing. Everything we cited for commercial success is in the public domain. Nothing shall have full and complete opportunity. So under those circumstances, we submit that the rule of PC broadband should include our situation. Is an enterprise reexamination a contested case? Not in accordance with the patent law's rules, no. Well, and the other thing is I kind of question whether on equal evidentiary footing, I mean, in light of your due process arguments in this case, it's clear that this isn't a full-blown evidentiary proceeding where both sides have an opportunity to take all of the evidence that they want. So I think that interparties reexams, unlike IPRs, allow for a lot less evidentiary undertaking. Well, but the evidence that we relied upon is in the public domain. There's no discovery needed. It's right there in the public domain. There's nothing that we took no discovery, couldn't take any discovery. We relied on public domain information. They had that equal access to that same public record information. So therefore, the parties were completely at par in terms of the evidentiary issues that relate to commercial success. And they submitted nothing. Okay, well, you're into your rebuttal time. Why don't we move on and hear from, I believe, Mr. Petrie. Are you going first? Yes, Your Honor. Good morning, Your Honor. Good morning, Your Honor. May it please the Court. I'd like to focus my time on just a few of the key issues that are raised in the Patent Owner's Appeal. First, the dicta that's in the footnote in In re Peterson. The Patent Owner argues that that footnote creates an exception to the rule where, as in this case, a claim range is fully encompassed by the range that's disclosed in the prior art. There's a prima facie case of obviousness. This case does not come within the possible exception that's set out in the footnote. That footnote is directed to broad claim ranges versus a, I mean, broad ranges in the prior art versus a possible distinct composition that's in the claim, or a broad genus versus specific substances that are in the claim. And here we don't have specific substances or distinct compositions. The claim broadly covers anywhere from 5% to 49% ammonium sulfate, or 2.5% to 25% elemental sulfur. And I think, Judge Stoll, this goes to your point about whether there's anything in the patent that explains the criticality of these specific ranges. If you look in column four of the patent, it sets out a table that describes the various ranges. On the right side of that table, it sets out the preferred ranges, and on the left side it sets out the broad ranges. What the 459 patent claims is the broad ranges, not the preferred ranges. And I think this is clearly shown on page three of the reply brief. Here the patent owner provides a diagram that shows the scope of what these claims cover. It covers all of the compositions that are within that red box on the lower left of the diagram. That's far different from distinct compositions or specific substances, which is the concern of the footnote in Ray Peterson. Is there anything you think in this patent that talks about whether in the broad range or the preferred range, how those ranges provide or are better to achieve the claimed objective of having a localized spot with a lower pH? Absolutely not, Your Honor. As the solicitor points out in their brief, when the patent is describing how to get those microenvironments, all it's saying is instead of using a bulk fertilizer, put it in granular form. So it's nothing about the specific ranges that are described. And this also goes to the point about the inherency feature, and I think, Judge Moore, you pointed out that there is a declaration in the record that supports the position that, in fact, in Bexton, the elemental sulfur, the ammonium sulfate, and the ammonium phosphate would each lower the pH in the soil. But if you look at what was before the board on appendix pages 2895 to 2898, there Dr. Blair also addressed the argument that they're raising now on the appeal that the phosphate would tend to create a buffer in the soil, and therefore it wouldn't lower the pH. Dr. Blair explained that, no, that doesn't happen in the concentrations of these elements that are in the soil. That's substantial evidence that would support the board's finding on that point. Turning real briefly then to the commercial success argument here, the board properly applied this court's law in finding that the patent owner failed to provide evidence that the commercial success of the microessentials product was due to the merits of the claimed invention. Beyond merely what the fertilizer components, beyond the fertilizer components themselves, all of which were already taught by Bexton. And here the patent owner's relying on the presumption of nexus, simply because the microessentials product was successful, and because it's within the broad scope of the 459 patent claims. And Judge Moore, as you pointed out, this is not a contested case, and so the presumption that applies in contested cases like district court infringement litigation, or in inter-parties review cases, it shouldn't apply in the re-examination. Why? Because, as you pointed out, we don't have the ability to go out and get the evidence that might tend to rebut these types of arguments. If you think about when the commercial success gets raised in the proceeding, it would be in the patent owner's response to the office action. Under the statute, the requester has 30 days to provide comments, and that can't be extended because it's in the statute. And so the patent owner would make these commercial success arguments in that response, and our next response would be due 30 days after that. And so we would have 30 days to go out and try to get some sort of evidence to rebut commercial success, the presumption of commercial success. And as this court has indicated in other cases, that evidence might be the commercial success was due to advertising, or it's due to customer support, or something like that. That's all information that we would have to go out and get from third parties in the market. But there is no ability to subpoena third parties in inter-parties re-examination proceedings. So for that reason, the presumption of nexus shouldn't apply here. And I think another reason in this specific case the presumption shouldn't apply, because what they're pointing to, they're arguing that the commercial success of micro-essentials gives rise to this presumption such that they can overcome the prima facie case of obviousness over Bexton. And they're arguing they get this presumption because it's successful, and it's because it's within the broad scope of the 459 patent claims. But what they're ignoring is that it's also within the scope of what's disclosed in Bexton. And that's why the board here was correct in applying this court's case law and requiring the patent owner to come forward with some evidence that the commercial success was due to the specific features of the 459 patent claims, namely the specific ranges, over and above what was already disclosed by Bexton. In addition, when it comes to invoking the presumption of nexus, isn't there some requirement that the commercial product has to have some kind of one-to-one correspondence with the patent claim itself? The claim is the product, and the product is the claim, as opposed to the product being one possible embodiment that is covered by a broad scope of the claim? Your Honor, I don't want to go so far to argue that you have to show like a one-to-one correspondence there. I think my colleague was thinking about the N. Ray Glatt case, and that said that you don't have to show all these different embodiments that would be successful that are within the scope of the claim. So I don't want to argue that far. But I will argue that these claims are very broad, even compared to the broader Bexton claims. And they've identified, what they say, three products that are within those claims.  So they haven't shown any commercial success over and above what's already disclosed in Bexton. So if Your Honors have no other questions, we respectfully request that the Board's decision be affirmed. Okay, Mr. Warrick. Good morning, Your Honors. May it please the Court? I'd like to address the due process issue that's been raised, and our position is that that issue was fully resolved in the Abbott decision, which determined that Section 24 subpoenas are not available in interparties' reexamination proceedings, which, as has been discussed, are not contested cases. In particular here, Specialty Fertilizer has had notice and an opportunity to be heard, and specifically an opportunity to rebut these statements that were made in the Hutter and Blair declarations. They submitted their own declarations, and they had no problem identifying numerous alleged problems with the declarations in their briefing to this Court. And to the points made in Specialty Fertilizer's brief, they primarily rely on various cases talking about more trial or adjudicatory-type settings, and not the type of examination proceeding that we're dealing with here. And in particular, they've cited the Gamble case repeatedly, which is a case from this Court, for the proposition that without the right to confrontation, lower court proceedings or agency proceedings are essentially nullified. And that's just not the case, because even in Gamble, the conclusion of the Court was that there was, even though there had been no confrontation in that particular case, there was an affirmance. And in that case, that turned on the fact that there was no prejudice to the appellant. On the range issue, I'd like to briefly just point out that because this is an examination proceeding and not a trial proceeding, as in an AIA trial, the burden is on the examiner to establish obviousness under 103, and therefore it's totally appropriate to shift the burden of production to the patent owner when we're dealing with ranges that are fully encompassed by the prior art, particularly when they're dealing with known components, with known properties. The proper approach in that case is to ask the patent owner to come forward with evidence of criticality, which would show that for some reason, a person of ordinary skill would not have turned to those specific ranges within the already disclosed range. Are you relying specifically on In re Pederson for that point? Well, In re Pederson is one of many cases, there are many cases that say even slightly overlapping ranges will give rise to that presumption. And Pederson says that that's even more so the case when you have a fully encompassed claimed range relative to the prior art. And here, I think it's important to note, it's somewhat telling that Specialty Fertilizer is only focusing on the prima facie case. They have not even attempted to establish criticality. When the board reversed the examiner and found that the claimed range would have been obvious, Specialty Fertilizer came back in a rehearing petition in which it had to raise all of its points of disagreement. And unexpected results was not one of those points. And therefore, it's been waived. Their entire argument rests on the idea that there should not have been a prima facie case shifting the burden back to them to establish why this was a particularly important range or would have produced unexpected results. Pederson says a prima facie case of obviousness typically exists when the range of claimed compositions overlap the ranges disclosed. And it talks in multiple places about the prima facie case. You referred to it as a presumption. And you said that there are other cases that says that presumption is true even when they're overlapping claimed ranges. Do any of our cases, to your knowledge, refer to it as a presumption? I'm trying to make sure that these legal words that we use are accurate and appropriate. Are you familiar with it? I mean, I don't see the word presumption in Pederson. I see it established as a prima facie case. And I'm thinking about how to phrase it. Sure. I would agree. Prima facie case would be the correct way to frame it to the extent I've referred to it as a presumption. I apologize. That's the more accurate. No, I'm just wondering, are you familiar with any cases using that word? This is not a hostile question. Sure. Not as I stand here today, Your Honor. All right. It feels like a key pivot point in this case, and maybe in a lot of PTO cases, is when the patent examiner agency invokes the notion of routine experimentation and then sometimes that can feel like a shortcut to get to the finish line, where the agency just says, oh, by the way, it would be routine experimentation to get to all these interesting claim ranges. The end. Rejection. And what I'm looking for is, are there some contours or principles that you can tell us on how the agency thinks about when it is right and when it is wrong to invoke the notion of routine experimentation? Yes, Your Honor. So I think the routine experimentation language shows up in two different contexts. First, in the context of making the prima facie case. And there I think it's just a shorthand that the agency uses to say, this is a situation where we need to put the burden of production back on the patent owner or the applicant. Right, but the agency has to make a conclusion or advance a rationale for why it thinks it's okay to push the burden away from itself and onto the applicant or patent owner. And what I'm looking for from you is if you can give me what is that rationale, what is that principle. So that principle was stated in Peterson, that where you're dealing with ranges of known components, known ingredients with known properties, and those ranges overlap, or especially when they completely encompass the claimed range, then at that point you can assume that one of ordinary skill in the art would have the motivation to design within those disclosed ranges and experiment with various percentages of those components. And then again, that just simply shifts the burden of production back to the patent owner to rebut that, usually by showing criticality through unexpected results. Now there are also cases that talk about routine experimentation in terms of the ultimate question of obviousness, and I think that's again just getting to this question of in view of any evidence put forward by the patent owner and in view of the prior art, is this a situation where someone is just making routine expected variations to the art that KSR talked about, or is this something where an inventor discovered something truly unexpected that one would not have otherwise come to through normal means. Okay, thank you Mr. Warrick. Mr. Collins, you have some rebuttal time. Your Honor, there was talk here about examination versus adjudicatory proceedings, etc. Well, if the patent office had arranged these proceedings to be truly examinational, we wouldn't be here arguing today about it. Because in a regular examination, you cannot come in with affidavits or declarations from third parties, particularly your own employees, saying that this is obvious over that. You see, the problem here is that they've allowed these kinds of declarations to come in without any corresponding cross-examination rights, which we deem to be directly against the constitutional right of due process. We think the law supports us in that. And so the problem here is that the proceeding is structurally, in this case, the proceeding was structurally unconstitutional. Mr. Collins, you indicated that when you sat down you were going to find a site for Judge Stoll. Yes. Were you able to find that site? The answer is no. I'm sorry, I did not find anything specific to the ranges. I'm sorry, I thought that was there, but I must admit that I did not. One last thing, Your Honor. On the commercial success issue, the board held that it was nothing that wasn't shown already in the prior art. But they got to that by the old favorite, the standby of routine experimentation. What they've done is made it completely circular and collapsed the analysis of commercial success to be equivalent to that of alleged obviousness. So in other words, they say, here's the prior art, you can do it by routine experimentation. You get over here to commercial success, they say, well, you can find it readily available through routine experimentation. So therefore, there's no difference in the analysis, and that's not the law. There's a different analysis for commercial success than for alleged obviousness. I will close by saying further, I think that if this court will take a unbiased look at what the panel of examiners did and ran versus the board opinion, if they're read side by side, I think the conclusion is inevitable that what the examiners did was far more nuanced and had much more... But with all due respect, we can't do that. We can't take an unbiased look... I'm sorry. Unless you want us to disregard our standard of review. We don't review the examiner's determination for substantial evidence and hold it up next to the board's determination for substantial evidence. We only review the board's determination for substantial evidence. We don't get to review things de novo. So you're asking us, you say, if you will only do this. Well, we can't do that, because the law doesn't allow us to. The law requires us to review these things for deference. All right. Then I... Let me restate it. The board's opinion is nothing but conclusory. It is nothing but a bunch of unbiased conclusions. And we submit that when you start really analyzing the references, each individually, what's in the references, the conclusion is inescapable that the board's decision should be reversed. Thank you. I thank all counsel for their argument. The case is taken under submission.